*402 Opinion of the Court by
LEVINSON, J.
In this consolidated appeal, both parties[1] challenge portions of the first circuit court’s orders granting in part and denying in part their cross-motions for summary judgment. The case arises out of a complaint filed by the plaintiff-appellee/cross-appellant Dairy Road Partners, dba Dairy Road Shell [hereinafter, DRP], and the plaintiff Shell Oil Company [hereinafter, Shell] seeking a declaration that the defendant-appellant/cross-appellee Island Insurance Company [hereinafter, Island] has a duty to defend and indemnify DRP and Shell, pursuant to four separate insurance policies issued by Island to DRP, in two separate lawsuits concerning an automobile accident allegedly caused by a DRP employee (collectively, “the underlying lawsuits”).[2] On cross-motions for summary judgment, the circuit court ruled that (1) Island is not required to defend or indemnify DRP or Shell pursuant to (a) DRP’s business auto policy or (b) DRP’s commercial general liability policy, but (2) a genuine issue of material fact remained with regard to whether Island is required to defend and indemnify DRP and Shell pursuant to DRP’s (a) commercial garage liability policy and (b) commercial umbrella insurance policy. Accordingly, the circuit court granted Island’s motion for summary judgment with respect to the business auto policy and the commercial general liability policy but denied it with respect to the commercial garage liability policy and the commercial umbrella insurance policy. The circuit court also purported to grant in part and deny in part DRP’s motion for summary judgment, although it articulated the same conclusions with regard to all four policies described above.
On appeal, Island argues that the circuit court erred in denying its motion for summary judgment with respect to its duty to defend and indemnify pursuant to the commercial garage liability policy and the commercial umbrella insurance policy because Island had made an adequate showing that there is no possibility of coverage under either policy. We hold that DRP established, as a matter of law, that there was a possibility of coverage under the commercial garage liability policy at the time of tender of defense. However, inasmuch as DRP raised the issue of indemnity in its complaint, in connection with which Island adduced uncon-troverted evidence demonstrating that the accident is not covered by the commercial garage liability policy, we hold that Island was entitled both to a judgment that it has no duty to indemnify DRP and that, as of the date of the entry of the circuit court’s judgment to that effect, Island’s duty to defend will also end. Therefore, pursuant to the commercial garage liability policy, Island is responsible for the costs of DRP’s defense incurred between the date of tender and the date of the circuit court’s judgment, but not for any subsequent costs. With respect to the commercial umbrella insurance policy, we hold, as a matter of law, that Island was entitled to a judgment that it had no duty to defend or indemnify DRP.
In its cross-appeal, DRP argues that the circuit court erred in granting Island’s motion for summary judgment in connection with Island’s duty to defend and indemnify, pursuant to the business auto policy and the commercial general liability policy, because there were no applicable exclusions to policy coverage and Island failed to demonstrate that there was no possibility of coverage under either policy. DRP further argues that the circuit court erred in denying its motions for reconsideration of the circuit court’s orders granting in part and denying in part its motions for summary judgment. With regard to the commercial general liability policy, we hold that Island was entitled to summary judgment on the issue of both its duty to defend and its duty to indemnify. With regard to the business auto policy, we *403 hold that Island is obligated to defend and indemnify DRP.
Accordingly, we vacate the circuit court’s Hawai'i Rules of Civil Procedure (HRCP) Rule 54 judgment and the foundational orders concerning the parties’ motions for summary judgment and remand for: (1) the entry of an order (a) granting in part and denying in part Island’s motion for summary judgment with respect to its duty to defend and indemnify DRP pursuant to the commercial garage liability policy, (b) denying Island’s motion for summary judgment with respect to Island’s duty to defend DRP pursuant to the business auto policy, and (c) granting Island’s motion for summary judgment with respect to Island’s duty to defend DRP pursuant to the commercial general liability policy and the commercial umbrella insurance policy; and (2) the entry of an order (a) granting in part and denying in part DRP’s motion for summary judgment with regard to the commercial garage liability policy, (b) granting summary judgment in favor of DRP with respect to Island’s duty to defend DRP pursuant to the business auto policy, and (c) denying DRP’s motion for summary judgment with respect to the commercial general liability policy and the commercial umbrella insurance policy.
I. BACKGROUND
A. The Underlying Lawsuits
On March 9,1994, June Wolken-Vierra, as guardian ad litem of Alan Kaua Vierra, a minor, and as personal representative of the estate of Alvin K. Vierra, Jr., filed a complaint (Civil No. 94-0157(2)) in the second circuit court, naming Shell, Garth Nakamura, and Brian Connelly as defendants. The complaint alleged in relevant part:
... On November 25, 1993, in the early morning hours, shortly before the death of ALVIN K. VIERRA, JR., ... NAKAMU-RA was consuming alcoholic beverages at the Dairy Road Station, Kahului, Hawaii.
... On Thursday, November 25, 1993, ALVIN K. VIERRA, JR. was hit by a vehicle driven by ... NAKAMURA, and[,] as he lay in the road[,] ALVIN K. VIER-RA, JR. was run over by a vehicle driven by ... CONNELLY.
... At all times material, ... NAKA-MURA! ] was employed by the SHELL OIL CO. and was acting within the scope of his employment when he consumed alcohol and drove a motor vehicle into ALVIN K. VIERRA, JR., who was a pedestrian.
[[Image here]]
... The conduct of Defendants [was] negligent.
... As a direct proximate and legal result of the conduct of Defendants aforesaid, or any of them, ALVIN K. VIERRA, JR. was killed after he sustained serious physical injury, pain and suffering!,] and other damages as shall be proved at the time of trial.
On February 6, 1995, Wolken-Vierra filed a motion for an order identifying DRP as a “Doe Partnership,” averring in an affidavit of counsel that “investigation has revealed that [DRP] was an employer of ... Nakamura.” The circuit court granted the motion in an order dated the same day.
On June 17,1994, Thelma Vierra and Alvin K. Vierra, Sr. (collectively, the Vierras), who are apparently the parents of the decedent, Alvin K. Vierra, Jr., filed a separate complaint (Civil No. 94-0452(2)) in the second circuit court, naming Shell, Nakamura, and Connelly as defendants. The Vierras’ complaint made allegations similar to those in Wolken-Vierra’s complaint. The Vierras’ complaint, however, also alleged vicarious liability on the part of Shell. On November 22, 1995, the Vierras filed a first amended complaint, naming DRP as a defendant and additionally alleging in relevant part that: (1) Nakamura had acted within the scope of his “agency or employment during the events that caused or contributed to the accident”; (2) DRP had been negligent in “allowing the drinking of alcohol on its premises”; and (3) DRP was vicariously liable for Nakamura’s negligence.
B. The Insurance Policies
On cross-motions for summary judgment in the present case, see infra, section I.C, both parties adduced evidence that, at the time of the alleged accident, DRP was the *404 named insured on four separate insurance policies issued by Island: (1) a business auto policy (Policy No. BAP 12054); (2) a commercial garage liability policy (Policy No. CGP 60245-01); (3) a commercial general liability policy (Policy No. IM 208018-01); and (4) a commercial umbrella insurance policy (Policy No. IUB 3713525-00).

1.The business auto 'policy

In the section entitled “PART IV—LIABILITY INSURANCE,” the business auto policy provides in relevant part:
A. WE WILL PAY.
1. We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.
2. We have the right and duty to defend any suit asking for these damages. However, we have no duty to defend suits for bodily injury or property damage not covered by this policy. We may investigate and settle any claim or suit as we consider appropriate. Our payment of the LIABILITY INSURANCE limit ends our duty to defend or settle.
[[Image here]]
D. WHO IS INSURED.
1. You are an insured for any covered auto.
(Emphases added.) “Bodily injury” is defined in Part I of the policy as “bodily injury, sickness or disease including death from any of these.”
Part II of the policy provides in relevant part that “ITEM TWO of the declarations shows the autos that are covered autos for each of your coverages. The numerical symbols explained in ITEM THREE of the declarations describe which autos are covered autos. The symbols entered next to a coverage designate the only autos that are covered autos.” “ITEM TWO of the declarations” section of the business auto policy was not made a part of either party’s filings in connection with the motions for summary judgment. As described infra, however, DRP adduced evidence of that page[3] as an attachment to, and basis for, a motion for reconsideration of the circuit court’s orders on the motions for summary judgment.
A “Renewal Certificate,” which was attached to both parties’ motions for summary judgment and which, by its terms, was “effective” as of the date of the accident, provides in relevant part:
In return for the payment of the renewal premium, and subject to all the terms of the policy, we agree with you to provide the Insurance as stated in this certificate.
3.This Policy consists of the following Coverage Part(s) for which a Premium is indicated. This Premium may be subject to adjustment.
COVERAGE PART(S) PREMIUM
[[Image here]]
Employer[]s Noiv-Ownership 92.
(Emphasis added.)
Finally, each party included, as an attachment to their motions for summary judg *405 ment, a document that appears to be a computer-printout entitled “DECLARATION PAGE—PART 2.” While the document contains little descriptive language, it appears to list two specific automobiles, together with coverage amounts, as well as premium amounts for “USE OF OTHER AUTO,” “EMPLOYER’S NON OWNED,” and “HIRED AUTO.” Two documents entitled “Amendment Of Declarations” list one additional vehicle each with premium amounts. It is uneontroverted that Nakamura’s vehicle was not among the four listed in the foregoing documents.
2. The commercial garage liability policy
Part IV of the commercial garage liability policy, entitled “LIABILITY INSURANCE,” provides in relevant part:
A. WE WILL PAY.
1. We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies caused by an accident and resulting from garage operations.
2. We have the right and the duty to defend any suit asking for these damages. However we have no duty to defend suits for bodily injury or property damage not covered by this policy. We may investigate and settle any claim or suit as we consider appropriate. Our payment of the LIABILITY INSURANCE limit ends our duty to defend or settle.
[[Image here]]
D. WHO IS AN INSURED
1. For Covered Autos.
a. You are an insured for any covered auto.
[[Image here]]
2. For Garage Operations Other Than Covered Autos.
a. You are an insured.
b. Your employees, directors, or shareholders are insureds, but only while acting within the scope of their duties.
(Bold face emphasis in original.) In Part I, “garage operations” is defined as
the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. Garage operations includes the ownership, maintenance or use of the autos indicated in PART II as covered autos. Garage operations also include all operations necessary or incidental to a garage business.
(Bold face emphasis in original.) (Underlined emphasis added.) “Bodily injury” is defined as “bodily injury, sickness or disease resulting from any of these,” and “accident” “includes continuous or repeated exposure to the same conditions resulting in bodily injury or property damage to the insured neither expected nor intended.” Moreover, “ ‘[y]ou’ and ‘your’ mean the person or organization shown as the named insured in ITEM ONE of the declarations.” (Bold face emphasis in original.)
The “declarations” page of the commercial garage liability policy provides in relevant part:
ITEM TWO SCHEDULE OF COVERAGES AND COVERED AUTOS
This policy provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those “autos” shown as covered “autos.” “Autos” are shown as covered “autos” for a particular coverage by the entry of one or more of the symbols from the COVERED AUTO Section of the Garage Coverage Form next to the name of the coverage. Entry of a symbol next to LIABILITY provides coverage for “garage operations.”
(Bold face emphasis in original.) In the blank provided next to “LIABILITY INSURANCE,” the symbol “29” is indicated as a “covered auto.” “ITEM THREE” of the policy defines symbol “29” as follows: “29 = NON-OWNED AUTOS USED IN YOUR GARAGE BUSINESS. Any auto you do not own, lease, hire or borrow used in connection with your garage business described in these declarations. This includes autos owned by your employees or members of *406 their households while used in your garage business.” (Bold face emphasis in original.)
3. The commercial general liability policy
In Section I, entitled “COVERAGES,” the commercial general liability policy provides in relevant part:
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of “bodily injury” or “property damage” to which this insurance applies. We will have the right and duty to defend any “suit” seeking those damages. We may at our discretion investigate any “occurrence” and settle any claim or “suit” that may result.
[[Image here]]
b. This insurance applies to “bodily injury” and “property damage” only if:
(1) The “bodily injury” or “property damage” is caused by an “occurrence” that takes place in the “coverage territory;” and
(2) The “bodily injury” or “property damage” occurs during the policy period.
[[Image here]]
2. Exclusions.
This insurance does not apply to:
[[Image here]]
g. “Bodily injury” or “property damage” arising out of the ownership, maintenance, use or entrustment to others of any aircraft, “auto[”] or watercraft owned or operated by or rented or loaned to any insured.
(Bold face emphases in original.) (Underlined emphases added.) “Occurrence” is defined by the policy as “an accident, including continuous or repeated exposure to substantially the same harmful conditions.” Section II, entitled “WHO IS AN INSURED,” provides in relevant part:
1. If you are designated in the Declarations as:
a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.
c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insured, but only with respect to their duties as your officers and directors. Your stockholders are also insureds but also with respect to their liability as stockholders.
2. Each of the following is also an insured:
a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you. ...
(Bold face emphases in original.) (Underlined emphases added.) Although not expressly entitled “Declarations,” a document accompanying the policy, which sets forth the premium amounts, policy period, and other information relevant to the individual coverage purchased by DRP, lists DRP as a partnership in its section designating “Form of Business.”
Section V defines “bodily injury” as “bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time,” and “occurrence” as “an accident, including continuous or repeated exposure to substantially the same general harmful conditions.”
4. The commercial umbrella insurance policy
Section 2 of the commercial umbrella insurance policy, entitled “INSURING AGREEMENTS,” provides in relevant part:
2.01 Coverage
We will pay the “Ultimate Net Loss” in excess of the “Retained Limit” the “insured” becomes legally obligated to pay as *407 damages because of “personal injury” or “property damage” to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided under Item 2.02 Defense, Settlement and Supplementary Payments. The “personal injury” or “property damage” must be caused by an “occurrence” which occurs during the policy period.
The policy defines “Ultimate Net Loss” as
the sums which you have paid or are responsible for paying either by adjudication or compromise providing that we have agreed in writing to settle losses covered under this policy. This excludes defense, settlement and Supplementary Payments, including those which are the responsibility of the carrier of the “underlying insurance”. All recoverages and salvages which are collectibles from any party shall be deducted in arriving at the “Ultimate Net Loss.”
The policy defines “Retained Limit” as the greater of
A) An amount equal to the limits of insurance applicable to “underlying insurance”; or
B) The amount specified in item 1.5 of the Declarations applying to damages arising out of any one “occurrence” not covered by underlying insurance”.
“Underlying insurance” is defined as “those policies designated in Item 1.6 of the Declaration or renewals or replacements thereof which are not more restrictive and any other ‘underlying’ insurance collectible by or payable on behalf of the ‘insured.’” “Personal injury” is defined, inter alia, as “[bjodily injury, sickness or disease sustained by a person and if resulting from the foregoing shall include disability, shock, mental anguish or mental injury.” “Occurrence” is defined in relevant part as “an act, accident or event resulting in ‘personal injury1 or ‘property damage.’ ”
Item 1.5 of the “Declarations” page lists the amount of $10,000.00 as the “Retained Limit” applicable to “occurrences” not covered by underlying insurance. Item 1.6 of the “Declarations” page lists DRP’s business auto policy, commercial general liability policy, commercial garage liability policy, and worker’s compensation policy, along with separate “retained limit” amounts for each.
Endorsement ICU-103 to the commercial umbrella insurance policy provides in relevant part:
Except to the extent coverage is provided in “underlying insurance” listed in Section 1.6 of this policy, this policy does not apply to ownership, maintenance, use, loading or unloading of:
[[Image here]]
3. any ... “auto” operated by any person in the course of that person’s employment by you.
This exclusion applies if coverage as listed in Item 1.6 of the Declarations is not available or is available only to the extent of lower limits.
5. Tender and refusal of defense
At some point prior to October 5, 1994, Shell tendered its defense in the Vierras’ lawsuit to Island, claiming to be an additional insured on Island’s commercial general liability policy and commercial garage liability policy. In a letter written by its counsel, dated October 5, 1994, Island refused Shell’s tender. In addition to discussing the applicable law, Island’s October 5, 1994 letter made the following observations about Island’s investigation and understanding of the facts of the ease:
A factual investigation of this matter is undeveloped largely in part because of pending criminal charges against Garth Nakamura, manager of and son of the owner of Dairy. Apparently after work, Mr. Nakamura had some beer to drink before proceeding home. He was operating his personal automobile when he struck the rear of Alvin K. Vierra, Jr.’s parked vehicle which had been pulled over on the shoulder of the highway and was disabled. A copy of the initial two pages of the Police Report is attached showing Garth Naka-mura to be operating his personal vehicle.
In a letter dated February 6, 1995, counsel for both Shell and DRP responded to Island’s October 5, 1994 letter, arguing that *408 Island had misinterpreted the commercial general liability policy and the commercial garage liability policy.
Additionally, on February 7, 1995, counsel for DRP tendered its defense in Wolken-Vierra’s lawsuit pursuant to the commercial garage liability policy, the commercial general liability policy, and the commercial umbrella insurance policy. Island again refused. On February 23, 1995, Island acknowledged receipt of a letter, dated February 13, 1995 from DRP’s counsel, tendering DRP’s defense pursuant to the business auto policy. Island refused that tender as well. No further correspondence appears in the record.
C. Procedural History
On April 3, 1995, DRP and Shell filed a complaint in the first circuit court praying for a declaration that Island was obligated to defend and indemnify DRP and Shell in the underlying lawsuits. On June 5,1996, Island filed a motion for summary judgment, asserting that, as a matter of law, it was entitled to a judgment in its favor declaring that “there is no defense or coverage owed to [DRP] or [Shell] for any of the claims made against them in either of the [underlying [a]ctions.” Among the attachments to Island’s motion were a copy of a two-page accident report prepared by the Honolulu Police Department on November 25,1993 and a copy of excerpts from the transcript of Nakamura’s deposition conducted on May 25, 1995. The police report indicated that Nakamura had been driving his own vehicle and that Alvin Vierra, Jr. had been involved in the accident; the police report, however, provided no other relevant details. Nakamura’s deposition, on the other hand, contained a number of details regarding the events resulting in the accident.
Nakamura testified that, on the date of the accident, he was employed as a manager of a gasoline station owned by DRP. Although his regular work hours were 8:00 a.m. to 4:30 p.m., Monday through Friday, Nakamura remained on call after hours for problems that his night staff could not solve. He testified, however, that he had rarely been called because of any such emergencies.
On the evening of the accident, November 24, 1993, Nakamura left work at 4:30 p.m. and returned home. He contacted several friends, and, together, they decided that they “just wanted to go out.” Because it was raining, the group “ended up” back at the gasoline station. Prior to arriving at the station, Nakamura and his friends had been consuming beer, and they continued to do so while gathered at the station. Nakamura had never before hosted a gathering of friends at the station or consumed alcohol on the premises.
Nakamura was not certain whether a written policy regarding the consumption of alcohol on the premises of the station had been adopted, but “[i]t was just a known thing that it was never allowed on the premises.” Na-kamura was aware that the foregoing rule applied to him. To his knowledge, his father, a part-owner of DRP, was unaware that Na-kamura had been drinking at the station. Nakamura further conceded that his gathering on the evening of November 24,1993 was “not authorized” by DRP or Shell.
At approximately 3:00 a.m. on November 25, 1993, the group disbanded, and Nakamu-ra drove away from the station in his own truck. He drove a friend home and was on his way to his own home when a collision occurred. Nakamura testified that he was unable to remember the details of the collision itself.
On July 10, 1996, DRP filed a motion for partial summary judgment, alleging, as a matter of law, that it was entitled to a declaratory judgment that Island was obligated to defend DRP and to reimburse it and Shell for attorneys’ fees and costs already incurred in defending against the underlying lawsuits.[4] DRP argued that Island owed a duty to defend pursuant to three of the four policies: the commercial general liability policy, the commercial garage liability policy, and the commercial umbrella insurance policy. Shell filed a joinder in DRP’s motion on September 3,1996. On the same date, Island filed a *409 memorandum in opposition to DRP’s motion for partial summary judgment, to which it attached, inter alia, an affidavit by James S. Araki, a claims representative employed by Island.
Araki averred that he was the claims representative “handling the claim ... involving [DRP] regarding a motor vehicle accident occurring on or about November 25, 1993[.]” He further averred that, “[a]s part of [the] investigation, [Araki] and others spoke with and obtained information from various persons,” including Nakamura, representatives of Nakamura’s automobile insurance carrier, a representative from Shell, Nakamura’s father, and “Eric Yamagata of Dairy Road Shell.” Based on the investigation,
Island Insurance obtained the following information:
a. Garth Nakamura was an employee of Dairy Road Shell.
b. Garth Nakamura was drinking alcohol on the premises of Dairy Road Shell from approximately 8:00 p.m. the evening before the accident, until 2:30 a.m. on the date of the accident.
e.Garth Nakamura was drinking with his friends, none of whom were employees of Dairy Road Shell.
d. The drinking event was not a company sponsored activity.
e. Mr. Glenn Nakamura, Garth Naka-mura’s father and a partner at [DRP], was not aware of the drinking of alcohol on the premises of Dairy Road Shell, referred to hereinabove.
f. Garth Nakamura was not working at the time of the accident.
g. Just before the subject accident, when Garth Nakamura left the Dairy Road Shell, he did so in his personal vehicle.
h. At the time of the subject accident, Garth Nakamura was operating his personal vehicle for a personal purpose.
Araki concluded that “no coverage was owed under certain policies of commercial, business and garage insurance issued by Island Insurance to [DRP] and, therefore, Island referred the matter to Roy F. Hughes, Attorney at Law, A Law Corporation, for a legal evaluation on the matter of coverage under the policies.” Araki’s affidavit did not reveal the dates on which Island ascertained any of the foregoing facts or events regarding the case.
Following a hearing conducted on September 6,1996, the circuit court filed two substantially identical orders. On October 10, 1996, the circuit court filed an order granting in part and denying in part Island’s motion for summary judgment, ruling as follows:
1. The Motion is granted as to the Business Automobile Insurance Policy on the basis that the involved vehicle was not listed in the policy as a covered auto.
2. The Motion is denied as to the Commercial Garage Liability Policy on the basis that there is a genuine issue of material fact as to whether Garth Nakamura’s actions were operations necessary or incidental to the garage business.
3. The Motion is granted as to the Commercial General Liability Policy on the basis that Exclusion 2(g) applies, and where the involved vehicle was owned and operated by Garth Nakamura, assuming arguendo that he was an “insured” under the policy (as an employee acting within the scope of his employment).
4. The Motion is denied as to the Commercial Umbrella Insurance Policy only as it applies to commercial garage liability on the basis that there is a genuine issue of material fact as to whether Garth Naka-mura’s actions were operations necessary or incidental to a garage business.
On October 17, 1996, in an order denominated “Order Granting In Part And Denying In Part Plaintiff Dairy Road Partners dba Dairy Road Shell’s Motion For Partial Summary Judgment Filed July 10, 1996,” the circuit court ruled as follows:
1. The Motion is denied as to the Business Automobile Insurance Policy on the basis that the involved vehicle was not listed in the policy as a covered auto.
2. The Motion is granted as to the Commercial Garage Liability Policy on the basis that there is a genuine issue of material fact as to whether Garth Nakamura’s *410 actions were operations necessary or incidental to the garage business.
3. The Motion is denied as to the Commercial General Liability Policy on the basis that Exclusion 2(g) applies, and where the involved vehicle was owned and operated by Garth Nakamura, assuming arguen-do that he was an “insured” under the policy (as an employee acting within the scope of his employment).
4. The Motion is granted as to the Commercial Umbrella Insurance Policy only as it applies to commercial garage liability on the basis that there is a genuine issue of material fact as to whether Garth Nakamura’s actions were operations necessary or incidental to a garage business.
(Emphases added.) The language highlighted above constitutes the only differences between the language of the circuit court’s October 10 and October 16 orders.[5]
On October 23 and 28, 1996, DRP filed two motions for reconsideration or, in the alternative, to alter or amend both of the circuit court’s orders concerning the parties’ motions for summary judgment. As noted supra in section I.B.2, DRP attached, inter alia, to its motions copies of “ITEM TWO of the declarations” contained in the business auto policy. In addition, on October 29,1996, DRP filed an affidavit of Roger Yamagata, DRP’s insurance agent. Yamagata averred in relevant part that
... [t]o ensure that all vehicles used in connection with the business operations was [sic] a covered auto under the policy for bodily injury and property damage liability protection, [DRP] purchased additional coverage for “Hired Autos” and employer’s “Non Owned Autos”.
... [DRP] paid additional premiums for the extended coverage as evidenced by the Renewal Certificate and Declaration page....
DRP argued that, based on the “new evidence” of “ITEM TWO of the declarations” page, the circuit court should reconsider its ruling with respect to the business auto policy. DRP further argued that a possibility of coverage would remain under the commercial general liability policy even “if the jury finds that Garth Nakamura was not acting within the course and scope of his employment.” (Bold face emphasis in original.) On October 30, 1996, Shell filed a joinder in DRP’s motions for reconsideration. The circuit court denied both of DRP’s motions by orders filed on December 11,1996.
On December 2,1997, Island filed a motion for certification pursuant to HRCP Rule 54(b) (1996).[6] The circuit court granted Island’s motion by an order filed on January 20, 1998 and filed a “Rule 54(b) Final Judgment” on February 24, 1998, entering judgment “in favor of Island ... and against [DRP] and Shell, that Island is not obligated to defend and/or to indemnify its insureds under the business automobile insurance policy and the commercial general liability policy” and “in favor of [DRP] and Shell and against Island, that Island is obligated to defend its insureds under the commercial garage liability policy and commercial umbrella insurance policy.”[7]
Both parties filed timely appeals.
*411 II. STANDARD OF REVIEW
We review [a] circuit court’s [grant or denial] of summary judgment de novo under the same standard applied by the circuit court. Amfac, Inc.[ v. Waikiki Beachcomber Inv. Co., 74 Haw. 85,] 104, 839 P.2d [10,] 22, [reconsideration denied, 74 Haw. 650, 843 P.2d 144 (1992) ] (citation omitted). As we have often articulated:
[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
Id. (citations and internal quotation marks omitted); see ... HRCP ... Rule 56(c) (1990).
Bronster v. United Public Workers, 90 Hawaii 9, 13, 975 P.2d 766, 770 (1999) (quoting Roxas v. Marcos, 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (quoting Estate of Doe v. Paul Revere Ins. Group, 86 Hawai'i 262, 269-70, 948 P.2d 1103, 1110-11 (1997) (quoting Morinoue v. Roy, 86 Hawai'i 76, 80, 947 P.2d 944, 948 (1997))) (some brackets added and some in original)).
“A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.” Hulsman v. Hemmeter Dev. Corp., 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).
Konno v. County of Hawai'i 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting Dunlea v. Dappen, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)).... “The evidence must be viewed in the light most favorable to the non-moving party.” State ex rel. Bronster v. Yoshina, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing Maguire v. Hilton Hotels Corp., 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, “we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion].” Maguire, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).
Estate of Doe, 86 Hawai'i at 270, 948 P.2d at 1111 (quoting Morinoue, 86 Hawai'i at 80, 947 P.2d at 948).
III. DISCUSSION
A. General Legal Principles Concerning The Interpretation Of Insurance Policies And The Parties’ Burdens Of Proof
Before addressing the parties’ arguments with regard to the individual policies, we note a few general principles of law that will guide us in dealing with each of the policies at issue in the present case.
1. Interpretation of insurance policies
We begin our analysis with the observation that “ ‘insurers have the same rights as individuals to limit their liability[ ] and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public policy.’” First Ins. Co. of Hawai'i Inc. v. State, 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (quoting 6B Appleman, Insurance Law and Practice § 4255, at 40 (1979)).... As such, “[insurance] policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended[.]” Id. at 423-24, 665 P.2d at 655 (citations omitted). Moreover, “[every] insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy[.]” [Hawai'i Revised Statutes] [QHRSD] § 431:10-237 [ (1993) ]; see State Farm Mut. Auto. Ins. Co. v. Fermahin, 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); Smith v. New England Mutual Life Ins. Co., 72 Haw. 531, 534, 827 P.2d 635, 636 (1992).
Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that “[because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer’s attorneys, we have long subscribed to the principle *412 that they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer.” Sturla, Inc. v. Fireman’s Fund Ins. Co., 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (citations and internal quotation marks omitted) (cited with approval in Fermahin, 73 Haw. at 566, 836 P.2d at 1077). “Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson.” Id. ...
Estate of Doe, 86 Hawai'i at 271, 948 P.2d at 1112 (quoting Dawes v. First Ins. Co. of Hawai‘i, Ltd., 77 Hawai'i 117, 121-22, 883 P.2d 38, 42-43, reconsideration denied, 77 Hawai'i 489, 889 P.2d 66 (1994)) (some brackets and ellipsis points added and some in original).
2. The parties’ burdens of proof
As movants for summary judgment, both Island and DRP bore the burden of showing, regarding their respective motions, (1) that there was no genuine issue of material fact and (2) that the movant was entitled to judgment as a matter of law. See supra section II.A. In defending against the opposing party’s motion, neither party could “rest upon the mere allegations or denials of his pleading, but his response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.” HRCP Rule 56(e). See also K.M. Young & Associates v. McClean Ranch Properties, Inc., 4 Haw.App. 657, 664, 675 P.2d 793, 799 (1983).
The present case concerns the extent of Island’s duties to defend and indemnify DRP pursuant to the four insurance policies. “It is well settled that the duty to provide coverage [ie., the duty to indemnify,] and the duty to defend on the part of an insurer are separate and distinct.” Sentinel Ins. Co., Ltd. v. First Ins. of Hawai‘i, Ltd., 76 Hawai'i 277, 291, 875 P.2d 894, 908 (1994) (citations omitted). Moreover, the parties’ respective burdens of proof with respect to the duties to indemnify and to defend are also distinct.
With respect to Island’s prayer for a declaration that it has no duty to defend DRP and Shell pursuant to the policies, Island’s already heavy burden of proof as a movant for summary judgment was significantly augmented. Cf. Morinoue, 86 Hawai'i at 81, 947 P.2d at 949 (noting, with respect to a motion for summary judgment by a claimant of real property, who was asserting title through adverse possession, that “the already formidable preconditions to prevailing on a motion for summary judgment combine with the similarly demanding requisites of a prima facie case of adverse possession in such a manner as to render the [movant’s] initial burden particularly heavy”).
“[T]he obligation to defend ... is broader than the duty to pay claims and arises wherever there is the mere potential for coverage.” Commerce [ & Indus. Ins. Co. v. Bank of Hawai'i, 73 Haw. 322,] 326, 832 P.2d [733,] 735, [reconsideration denied, 73 Haw. 625, 834 P.2d 1315 (1992) ] (emphasis added) (citations omitted). In other words, the duty to defend “ ‘rests primarily on the possibility that coverage exists. This possibility may be remote but if it exists[,] the [insurer] owes the insured a defense.’ ” Standard Oil Co. of California v. Hawaiian Ins. & Guar. Co., Ltd., 65 Haw. 521, 527, 654 P.2d 1345, 1349 (1982) (quoting Spruill Motors, Inc. v. Universal Under. Ins. Co., 212 Kan. 681, 686, 512 P.2d 403, 407 (1973)) (emphasis added). “All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured[.]” Trizec Properties, Inc. v. Biltmore Constr. Co., 767 F.2d 810, 812 (11th Cir.1985) (citing 7C Appleman, Insurance Law & Practice, 99-100 (Berdal ed.1979)).
Sentinel Ins. Co., 76 Hawai'i at 287, 875 P.2d at 904 (brackets in original). See also Hawaiian Holiday Macadamia Nut Co., Inc. v. Industrial Indem. Co., 76 Hawai'i 166, 169, 872 P.2d 230, 233 (1994).
Accordingly, in connection with the issue of its duty to defend, Island bore the burden of proving that there was no genuine issue of material fact with respect to whether a possibility existed that DRP would incur liability for a claim covered by the policies. In other words, Island was required to prove that it would be impossible for the Vierras or Wolken-Vierra to prevail against DRP in the un *413 derlying lawsuits on a claim covered by the policies. Conversely, DRP’s burden with respect to its motion for summary judgment was comparatively light, because it had merely to prove that a 'possibility of coverage existed. See Montrose Chemical Corp. of California v. Superior Court, 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 475, 861 P.2d 1153 (1993) (holding that “the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot” (emphasis in original), and explaining that “[a]ny seeming disparity in the respective burdens merely reflects the substantive law”).
With respect to Island’s prayer for a declaration that it had no duty to indemnify DRP and Shell pursuant to the policies, Island was not required to disprove any possibility that its insured might be liable for a claim asserted in the underlying lawsuits. Rather, without reference to what the eventual outcome of the underlying lawsuits might actually be,[8] Island was required only to establish the absence of a genuine issue of material fact regarding the question of coverage pursuant to the plain language of the insurance policies and the consequent entitlement to the entry of judgment as a matter of law. Cf. Sentinel Ins. Co., 76 Hawai'i at 287, 875 P.2d at 904 (noting that insurer would be subject to duty to indemnify insured only if, pursuant to plain language of insurance policy, insured could become “legally obligated to pay” damages under circumstances falling within sphere of policy’s coverage); Cole v. East Hartford Estates Limited Partnership, 1996 WL 292135 *2 (Conn.Super.Ct. May 15, 1996) (“A duty of indemnity is owed to the insured for any loss or injury which comes within the coverage provisions of the policy, provided it is not removed from coverage by a policy exclusion. The existence of such a duty depends upon the true state of facts surrounding the loss or injury.... The duty to defend, by contrast, does not depend on whether the injured party will prevail against the insured[.]”).
With the foregoing principles in mind, we turn to the construction of the individual policies in light of the record before us. For purposes of analytical clarity, we begin with a consideration of the commercial garage liability policy.
B. DRP Was Entitled to Summary Judgment With Respect To Island’s Duty To Defend DRP As Of The Time Of Tender Of Defense Pursuant To The Commercial Garage Liability Policy; However, Island Was Entitled To Summary Judgment With Respect To Its Duty To Indemnify.
1. DRP was entitled to summary judgment with respect to Island’s duty to defend DRP as of the time of tender of defense pursuant to the commercial garage liability policy because a possibility of coverage existed.
“ ‘The nature of the ... duty [to defend] ... is purely contractual and depends, in the first instance, on the language of the particular policy involved.’ ” Hawaiian Ins. & Guar. Co., Ltd. v. Brooks, 67 Haw. 285, 289, 686 P.2d 23, 26 (1984) (quoting Ritter v. United States Fidelity & Guar. Co., 573 F.2d 539, 542 (8th Cir.1978)). Island contracted to defend DRP against “any suit asking for” damages arising out of an accident incident to “garage operations,” but its commercial garage liability policy excluded “suits for bodily injury or property damage not covered by this policy.” Island argues that the exclusion applies to the underlying lawsuits against DRP because the facts averred in AraM’s affidavit and reflected in Nakamura’s deposition conclusively established that Nakamura had not been using his vehicle in furtherance of any “garage business.”
As Island appears to concede, its duty to defend must be determined, at least initially, as of the time of DRP’s tender of its defense in the underlying lawsuits. See Sentinel, 76 Hawai'i at 288, 875 P.2d at 905 (noting that “whether an insurer’s refusal to defend was justified must be answered in light of the information available to the insurer at the time it made the refusal” (citing *414 Hawaiian Ins. & Guar. Co., Ltd. v. Blanco, 72 Haw. 9, 17, 804 P.2d 876, 880 (1990))); Commerce & Indus. Ins. Co., 73 Haw. at 327, 832 P.2d at 736 (holding that the duty to defend “ ‘is determined at the time suit is brought and not at the conclusion of litigation’ ” (quoting First Ins. Co. of Hawaii, Inc. v. State, 66 Haw. 413, 420, 665 P.2d 648, 653 (1983))). Island does not dispute that the complaints in both of the underlying lawsuits allege claims that, if proven, would be covered by the policy. However, relying on this court’s opinion in Standard Oil, Island argues that it was “required to look beyond the [c]omplaint[s] and other pleadings to consider any facts brought to its attention with respect to whether a duty to defend actually exists.” (Emphasis added.)
Island’s claim that it was “required” to investigate “beyond” the complaints is somewhat disingenuous. In Standard Oil, this court addressed an insurer’s contention that its insured had waived the insurer’s duty to defend by failing to provide timely notice of a claim covered by the policy. 65 Haw. at 522, 654 P.2d at 1346. The case arose out of an airplane crash that appeared to have been caused by “contaminants to the fuel strainer of the left engine. The tanks feeding the engine had been fueled from an aviation re-fueler truck covered by a liability insurance policy issued by [the insurer] on behalf of [the defendants in the underlying lawsuit].” Id. The estates of the victims of the crash sued, alleging in relevant part that the defendants had been negligent “in servicing, maintaining and repairing the subject aircraft, and in failing to detect and remove blockages and obstruction to the flow of fuel into the engines ....” Id. at 526, 654 P.2d at 1348-49 (emphases in original) (internal quotation signals omitted). This court held that the defendants in the underlying lawsuit had forwarded the complaint to the insurer in a timely matter and determined that the complaint, by its allegations,
should have alerted [the insurer] to the possibility that the refueler truck which was covered by its policy might have been involved. The vehicle was clearly listed in the insurance contract as a gas tank truck used by [one of the defendants] in its aviation-connected activities which, of course, included the refueling of aircrafts. Contrary to [the insurer’s] contentions, the pleadings did not have to specifically mention the refueler truck or establish that the refueler truck was the cause of the accident.
Id. at 526-27, 654 P.2d at 1349.
In this connection, this court held that the insureds in Standard Oil “had the right to expect that their insurance company would make a determined effort to ascertain[,] not only from the pleadings[,] but also from the insurer’s own independent investigation[,] whether the insured[s were] entitled to defense representation under the policy.” 65 Haw. at 527, 654 P.2d at 1349 (emphasis added). In other words, although the complaint did not expressly allude to or otherwise identify the refueler truck that was covered by the insurance policy, for purposes of determining whether the insurer was properly placed on notice of a covered claim, the insurer was charged with discovering that the insured refueler truck was implicated by the complaint. In that context, this court further observed that
[a]n insurer must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend.... [T]he duty to defend rests primarily on the possibility that coverage exists. This possibility may be remote, but[,] if it exists[,] the company owes the insured a defense. The possibility of coverage must be determined by a good-faith analysis of all information known to the insured or all information reasonably ascertainable by inquiry and investigation.
Id. (quoting Spruill Motors, Inc., 512 P.2d at 407) (some brackets added and some in original). Accordingly, Standard Oil stands for the proposition that, where the insured tenders his or her defense in a lawsuit in which the complaint does not clearly and unambiguously assert a covered claim, the insurer, as a precondition to refusing the tender on the ground that there is no possibility of coverage, must nevertheless conduct a reasonable *415 investigation to ensure that the facts of the case do not obligate it to defend the insured.[9]
In the present case, the underlying complaints are unambiguous as to the potential for coverage pursuant to the commercial garage liability policy. Both complaints allege that Nakamura was acting within the scope of his employment when he negligently struck Vierra with his vehicle. Both also state claims of negligence against DRP based upon Nakamura’s drinking on the premises of the gasoline station. Accordingly, both complaints alleged that Vierra suffered bodily injury arising from an accident connected with “garage operations.” Thus, there was no need for Island to look further than the allegations of the complaints in the underlying lawsuits to trigger its duty to defend.
The more pertinent question is whether, for the purposes of overcoming the duty to defend, Island was permitted to conduct a factual investigation despite the allegations of the underlying complaints. In this connection, Island points to this court’s opinions in Brooks and Blanco and the Intermediate Court of Appeals’s (ICA) opinion in Bayudan v. Tradewind Ins. Co., Ltd., 87 Hawai'i 379, 957 P.2d 1061 (App.1998). In Bayudan, the ICA observed in dictum[10] that, “[i]n two cases decided after Standard Oil, [i.e., Brooks and Blanco,] the supreme court apparently allowed insurers to look to facts gleaned from sources other than the pleadings as a basis for refusing to defend.” 87 Hawai'i at 384, 957 P.2d at 1066.
In Brooks, the insured[11] was driving his pickup truck when he allegedly encountered the plaintiff in the underlying lawsuit, who was walking along the highway. 67 Haw. at 286, 686 P.2d at 24. The insured offered her a ride. Id. After she climbed into the back of the truck, the plaintiff in the underlying lawsuit was “assaulted, battered, and raped” by the insured’s passenger. Id. In her complaint, the plaintiff alleged that the insured had been negligent in failing to restrain his passenger or aid the plaintiff. Id. at 287, 686 P.2d at 25.
The insurer filed a complaint in the circuit court praying for a declaration that, pursuant to a policy provision excluding intentional acts, it had no duty to defend or indemnify the insured. On appeal, this court held that the facts of the case indicated that the insured’s act was “anything but accidental” and that the insurer was entitled to rely on the exclusionary provision. Id. at 292, 686 P.2d at 27-28. In so holding, this court invoked an affidavit, filed in the declaratory judgment action, in which the insured averred that “he was the driver of the vehicle in which the rape occurred. He further acknowledged he ‘could see the incident taking place in the back of the truck.’ ” Id. at 292, 686 P.2d at *416 28. The Brooks court neither cited any authority nor articulated any rationale explaining its resort to evidence extrinsic to the insurance policy and the complaint in arriving at its ultimate conclusion regarding the duty to defend.
In Blanco, the named insured under a homeowner’s policy tendered his defense to his insurer in connection with a lawsuit alleging that he had fired a rifle in the direction of his neighbor, injuring the neighbor and causing the neighbor’s wife serious mental and emotional distress. 72 Haw. at 11-12, 804 P.2d at 877-878. The insured was charged criminally in connection with the incident and eventually pled no contest to a charge of attempted assault in the first degree. Id. at 12, 804 P.2d at 878. Subsequently, the neighbor and his wife filed a complaint alleging that the insured had acted intentionally or, in the alternative, negligently in causing their claimed injuries. Id. at 12, 804 P.2d at 878. As in Brooks, the insured’s policy contained an exclusion for intentional acts. Id. at 11-12, 804 P.2d at 878. After the insurer refused the insured’s tender of defense, the insured responded, through his counsel, that, inter alia, “[the insured] did not intend to [shoot] [his neighbor] but shot away from [him] and there must have been a ricochet if [his neighbor] was hit at all.” Id. at 13, 804 P.2d at 879.
Subsequently, in the underlying personal injury lawsuit, the insured and his neighbors entered into a stipulation, which stated in relevant part that,
... [o]n or about May 6, 1987, [the insured] failed to act with due care towards [his neighbor] by discharging his loaded rifle four (4) times from a distance of about 25 feet, and thus, did negligently injure and harm [his neighbor]. Each bullet struck objects located fifteen (15) feet from where [his neighbor] was standing. As a direct and proximate result of the several shots fired, one of the bullets struck an object which in turn struck [the insured’s neighbor] in his right leg, causing bodily injury to [the neighbor].
... [The insured] did not intend to injure [his neighbor] but only wanted to scare him.
... Such injuries were caused without any intentional act, negligence, or provocation on the part of [the neighbors]....
... During the incident above described, [the insured’s neighbor’s wife and other witnesses] were lawfully standing a few feet away from [the insured] on their residence property while [the insured] was negligently discharging his loaded rifle, and did witness said shooting.
... [The insured] negligently failed to act with due care with respect to [his neighbor’s wife,] and[,] thus, negligently inflicted serious emotional and psychological trauma and distress upon [her].
Id. at 14, 804 P.2d at 879. After an arbitrator entered an award in favor of the insured’s neighbors, the neighbors applied to the insurer for compensation. Id. at 14-15, 804 P.2d at 879. The insurer brought a declaratory action in the circuit court to clarify its duties pursuant to the policy. Id. at 12-15, 804 P.2d at 878-79.
On appeal, after citing to Standard Oil, the Blanco court examined the information available to the insurer both at the time the defense was tendered and at the time it was refused. In addition to the complaint in the underlying lawsuit, the Blanco court noted that the insurer “had available to it the fact of [the insured’s] no contest plea to attempted assault in the first degree, a willful and/or intentional crime.” Id. at 17, 804 P.2d at 880. However, “a plea of no contest, by the weight of authority, cannot be used against the person making it as an admission in any civil suit for the same act.” Id. at 17, 804 P.2d at 880 (citation omitted). Moreover, the Blanco court noted that, although “the fact of [the insured’s] conviction would be evidence ... of his commission of the crime in question in a civil action,” id. (citing Asato v. Furtado, 52 Haw. 284, 474 P.2d 288 (1970)), because it could not be considered “conclusive evidence,” the insurer “could not rely solely on the conviction in refusing to defend.” Id.
The Blanco court also observed that the insurer “had available the extensive police report[,] which clearly indicated an intentional firing of the rifle” based on the insured’s own statements to the police, as well as the *417 insured’s representations to the insurer through counsel, which this court interpreted as an assertion that the insured’s “intent in firing the rifle was only to scare [his neighbor].” Id. at 17-18, 804 P.2d at 880. Based on the foregoing information, this court held that “we do not see how it logically can be said that ... the injury to [the neighbor] was the result of an accident. Given the best possible interpretation, [the insured] fired the rifle in [his neighbor’s] direction intending to frighten him.” Id. at 18, 804 P.2d at 881. Likewise, with respect to the insured’s neighbor’s wife, the Blanco court relied upon the “undisputed evidence in the record” to hold that the insured should have expected to be witnessed while shooting at his neighbor. Id. at 19, 804 P.2d at 881 (emphasis added).
This court’s primary purpose in Brooks and Blanco was to ensure that plaintiffs could not, through artful pleading, bootstrap the availability of insurance coverage under an insured defendant’s policy by purporting to state a claim for negligence based on facts that, in reality, reflected manifestly intentional, rather than negligent, conduct. See also Bayudan, 87 Hawai'i at 387, 957 P.2d at 1069. With respect to the facts as alleged within the four corners of a complaint, we do not disturb the Brooks /Blanco analysis. In other words, when the facts alleged in the underlying complaint unambiguously exclude the possibility of coverage, conclusory assertions contained in the complaint regarding the legal significance of those facts (such as that the facts as alleged demonstrate “negligent” rather than “intentional” conduct) are insufficient to trigger the insurer’s duty to defend. See supra note 9. However, the ancillary rule that the Bayu-dan court reasonably derived from this court’s analysis in Blanco and Brooks—ie., that insurers may generally overcome then-duty to defend by relying on “factual” sources beyond the pleadings—has consequences that this court did not anticipate.
One consequence of the Bayudan corollary to the Brooks /Blanco analysis is that the insured may be saddled with the Procrustean dilemma of being forced to adduce facts proving his or her own liability in the underlying lawsuit in order to satisfy the insurer that there may be merit to the underlying covered claim. In the present matter, for example, DRP must admit liability and prove that Nakamura was acting within the scope of his employment on the night in question— perhaps traveling “on call”—in order to demonstrate to Island that coverage pursuant to the commercial garage liability policy is triggered. We do not believe that DRP could reasonably have anticipated such a self-defeating burden when it purchased the policies at issue in the present case. Cf. North Pacific Ins. Co. v. Wilson’s Distrib. Service, Inc., 138 Or.App. 166, 908 P.2d 827, 832 (1995) (holding that an insurer’s prayer for a declaratory action that it need not indemnify its insured should be stayed pending the resolution of the underlying lawsuit because such premature litigation “put[s] the [insureds] in the conflietive position of being required to abandon their denial of liability in [the underlying] action in order to come within the exception of the policy exclusion ... [and][a]n insurer may not put its insured in that position.”)
Additionally, the Bayudan corollary raises the potential for inconsistent judgments. A circuit court presiding over a declaratory judgment action might rule, based on an insurer’s superior production of evidence concerning material facts that will be directly in dispute in the underlying lawsuit, that there is no possibility of coverage. Subsequently, the trier of fact in the underlying lawsuit, not bound by the ruling in the declaratory judgment action (the latter having no preclusive effect upon a non-party putative plaintiff), and perhaps relying upon different evidence adduced by the injured plaintiff, might find that the insured is liable on a claim covered by the policy. Such a result would be fundamentally unfair to the insured, inasmuch as, in retrospect, there must have been a possibility of coverage if, in fact, it is so adjudicated in the underlying lawsuit. Inasmuch as the circuit court would already have ruled that there was no possibility of coverage, and therefore no duty to defend, the insured would be barred by res judicata from recovering post-trial attorney’s fees and costs from the insurer.
*418 We note that there is a split of authority among other jurisdictions on the issue of an insurer’s use of extrinsic evidence to disclaim its duty to defend, despite the presence of allegations set forth in the complaint, which, if true, establish the possibility of coverage. Some courts allow insurers freely to rely upon any competent evidence in favor of their positions. See, e.g., Winnacunnet Cooperative School Dist. v. National Union Fire Ins. Co. of Pittsburgh, 84 F.3d 32, 35-36 (1st Cir.1996) (applying New Hampshire law); Tschimperle v. Aetna Cas. & Sur. Co., 529 N.W.2d 421, 424 (Minn.Ct.App.1995); Pennsylvania Millers Mut. Ins. Co. v. Rigo, 256 A.D.2d 769, 681 N.Y.S.2d 414, 415 (N.Y.App.Div.1998). It appears, however, that the majority of jurisdictions addressing the issue forbid insurers from relying upon extrinsic evidence for the purpose of disclaiming the duty to defend. See, e.g., State Dep’t of Transp. and Pub. Facilities v. State Farm Fire and Cas. Co., 939 P.2d 788, 792 n. 1 (Alaska 1997); Penn-America Ins. Co. v. Disabled American Veterans, Inc., 224 Ga.App. 557, 481 S.E.2d 850, 852 (1997); Penney v. Capitol City Transfer, Inc., 707 A.2d 387, 389 (Me.1998); Scopel v. Donegal Mut. Ins. Co., 698 A.2d 602, 605 (Pa.Super.Ct.1997); Atlantic Mut. Ins. Co. v. Badger Med. Supply Co., 191 Wis.2d 229, 528 N.W.2d 486, 491 (Ct.App.1995); see also 7C John Alan Apple-man, Insurance Law and Practice § 4684 (1979) (noting that, “in general, the courts state that the duty to defend is separate from the duty to make a claim payment and that the insurer’s initial obligation is determined by the allegations in the complaint, and not on other information in its possession”); 1 Rowland H. Long, The Law of Liability Insurance § 5.02(2)(ii) (1998) (noting that “the courts generally have held that the duty to defend cannot be negated by extrinsic facts known to the insurer”); 14 George J. Couch, Couch Cyclopedia of Insurance Law § 51:51 (Mark S. Rhodes, ed., 2d ed.1982) (noting the split of authority).[12] A limited exception to the majority rule described above has been recognized by several jurisdictions, which allow an insurer to rely upon extrinsic facts to disclaim liability only when the relevant facts “will not be resolved by the trial of the third party’s suit against the insured.” Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402, 406 (1984). See also Millers Mut. Ins. Ass’n of Illinois v. Ainsworth Seed Co., Inc., 194 Ill.App.3d 888, 141 Ill.Dec. 886, 552 N.E.2d 254, 256 (1990) (“[N]o consideration [can] be given to factual matters which might be relevant to issues in the underlying litigation.” (Citation omitted.)).
Although Brooks appears to allow insurers generally to rely upon extrinsic facts when attempting to disclaim their duty to defend in declaratory judgment actions, the circumstances of that case place it within the “limited exception” allowing for proof of factual matters not susceptible of resolution in the underlying litigation. In the declaratory *419 judgment action at issue in Brooks, the controverted factual matter was whether the insured’s conduct had been “accidental” or “intentional.” See Brooks, 67 Haw. at 290, 686 P.2d at 27. The plaintiff, in the underlying complaint, had stated a claim against the insured sounding solely in negligence. Id. at 287, 686 P.2d at 26. As discussed more fully below, the issue of the insured’s “intent” was therefore not before the jury in the underlying lawsuit.
It is well established that
[t]he elements of a cause of action founded on negligence are:
1. A duty or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;
2. A failure on the defendant’s part to conform to the standard required: a breach of the duty;
3. A reasonably close causal connection between the conduct and the resulting injury[;] and
4. Actual loss or damage resulting to the interests of another.
Tseu ex rel. Hobbs v. Jeyte, 88 Hawai'i 85, 91, 962 P.2d 344, 350 (1998) (quoting Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (citations and ellipsis points omitted) (some brackets added)). See also Takayama v. Kaiser Found. Hosp., 82 Hawai'i 486, 498, 923 P.2d 903, 915-16 (1996) (same). Inasmuch as the focus of the inquiry in a garden variety negligence action is the objective reasonableness of a defendant’s conduct {i.e., whether the defendant conformed to a required standard of conduct) and the consequences of that conduct (i.e., whether the plaintiff suffered loss attributable to the defendant’s conduct), the trier of fact is not called upon to determine the precise nature of the defendant’s state of mind. See Booth v. Mary Carter Paint Co., 182 So.2d 292, 299 (Fla.Dist.CtApp.1966) (“[N]egligenee and intention have no necessary connection. Negligence is not depen-dant upon bad intention, nor is it necessarily negatived by good intention. When the legal rights of others are involved, the question of negligence vel non must stand on the facts themselves, uninfluenced by intention.”); OMI Holdings, Inc. v. Howell, 260 Kan. 305, 918 P.2d 1274, 1294 (1996) (noting that “[[Intent is irrelevant in the simple negligence analysis”); Doe v. Doe, 878 P.2d 1161, 1162 (Utah Ct.App.1994) (“An individual’s acts can simultaneously give rise to a claim for negligence and a claim for an intentional tort. The two doctrines are not necessarily mutually exclusive, but rather may overlap and coexist on a continuum.... A finding of gross negligence does not preclude a finding of intent and a finding of willful misconduct does not preclude elements of negligence.” (Citations and internal quotation signals omitted.)).
We recognize that a number of jurisdictions have held that evidence of intentional conduct may not support a claim for negligence. See, e.g., American Nat’l Fire Ins. Co. v. Schuss, 221 Conn. 768, 607 A.2d 418, 422-23 (1992); Landry v. Leonard, 720 A.2d 907, 910-11 (Me.1998); Waters v. Blackshear, 412 Mass. 589, 591 N.E.2d 184, 185 (1992); Miller v. Kruetz, 643 S.W.2d 310, 313 (Mo.Ct.App.1982); Lail v. Woods, 36 N.C.App. 590, 244 S.E.2d 500, 502, review denied, 295 N.C. 550, 248 S.E.2d 727 (1978); Andres v. Perry, 81 A.D.2d 848, 438 N.Y.S.2d 852, 853 (N.Y.App.Div.), aff'd, 54 N.Y.2d 795, 443 N.Y.S.2d 610, 427 N.E.2d 769 (1981); Kasnick v. Cooke, 116 Or.App. 580, 842 P.2d 440, 441 (1992); Fulmer v. Rider, 635 S.W.2d 875, 881 (Tex.Ct.App.1982); Kobos ex rel. Kobos v. Everts, 768 P.2d 534, 538 (Wyo.1989). These decisions are grounded in the proposition that “the words ‘negligence’ and ‘intentional’ are contradictory,” Miller, 643 S.W.2d at 313, inasmuch as negligence connotes carelessness, whereas intent connotes purposefulness. However, in this jurisdiction, we have never restricted claims sounding in negligence to unintentional or “careless” conduct. As described supra, a cause of action sounding in negligence will lie if the defendant breaches a duty owed to the plaintiff, thereby legally causing the plaintiff injury. So long as “such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other,” Tabieros v. Clark Equipment Company, 85 Hawai'i 336, 353, 944 P.2d 1279, *420 1296 (1997) (citations and internal quotation signals omitted), ie., so long as the defendant owes the plaintiff a duty, the thoughts passing through the defendant’s mind as he or she breaches that duty are immaterial.
In a tort action, the defendant’s state of mind is relevant only when the plaintiff alleges that the defendant’s conduct was intentionally tortious and/or the plaintiff is seeking to recover punitive—as opposed to merely compensatory—damages from the defendant. See, e.g., Dunlea v. Dappen, 83 Hawai'i 28, 38, 924 P.2d 196, 206 (1996) (describing the elements of the tort of intentional infliction of emotional distress); Masaki v. General Motors Corp., 71 Haw. 1, 7, 780 P.2d 566, 571 (1989) (“[T]o justify an award of punitive damages, a positive element of conscious wrongdoing is always required.” (Citation and internal quotation marks omitted.)). A showing that the defendant’s actions were intentional may allow the plaintiff to obtain punitive as well as compensatory damages. See Amfac, Inc., 74 Haw. at 138, 839 P.2d at 37 (holding that, for an award of punitive damages, “[t]he plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of conscious indifference to the consequences” (quoting Masaki 71 Haw. at 16-17, 780 P.2d at 575 (citation omitted))). A plaintiff who fails to allege such wilful, wanton, malicious, or intentional conduct—notwithstanding that it may have occurred—and who, instead, merely alleges that the defendant breached a duty of care, waives the opportunity to recover punitive damages. In effect, such a plaintiff has “undercharged” his or her case against the defendant, just as a prosecutor may undercharge a criminal defendant and successfully convict him or her of an offense requiring a lesser state of mind than that demonstrated by the evidence of the case. See, e.g., State v. Holbron, 80 Hawaii 27, 44, 904 P.2d 912, 929 (1995) (“Within constitutional limits, it is always the prosecution’s prerogative to undercharge any offense for whatever reason it deems appropriate.... Thus, it is self-evident ... that the prosecution may charge an intentional or knowing homicide (murder) as a reckless homicide (manslaughter) if it wants to, just as it may charge an intentional or knowing infliction of serious bodily injury (assault in the first degree) as a reckless infliction of serious bodily injury (assault in the second degree).”); HRS § 702-208 (1993) (providing in relevant part that “[w]hen the law provides that negligence is sufficient to establish an element of an offense, that element also is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly”).
The contrary rule, embraced by the jurisdictions cited above, leads to the absurdity of allowing the defendant to raise, as an exonerating defense to a claim of negligence, that he or she purposefully injured the plaintiff. In Schuss, for example, the defendant was alleged to have set fire to a synagogue. 607 A.2d at 419. After a jury verdict finding the defendant liable pursuant to a claim of negligence, the trial court granted the defendant’s motion to set the verdict aside on the basis that the evidence established that the defendant had intentionally burned the building. Id. at 421. The Connecticut Supreme Court affirmed the trial court, quoting Professors Prosser and Keeton for the proposition that “[t]he distinction between intentional and unintentional invasions draws a bright line of separation among shadings of almost infinitely varied human experiences.... As [Justice Oliver Wendell] Holmes observed, even a dog knows the difference between being tripped over and being kicked.” Id. at 422 (quoting W.P. Keeton, Prosser and Keeton on the Law of Torts § 8, at 33 (5th ed.1984) (hereinafter, Prosser)).
While Justice Holmes’s proverbial dog might have known the difference between a trip and kick, we believe that the dog would have been quite surprised to learn that a defendant could be exonerated by virtue of the latter mechanism of its injury but not the former. We find the following observation of the Missouri Supreme Court particularly apt:
The same principle carried to its logical conclusion would lead to the result that every action for negligent wrong could be *421 defeated by a showing that there lurked inside the brain of the wrongdoer the secret intention to perpetrate the act. To avoid this[,] the common law permitted the injured party to waive the intent[] and rely upon the neglect.
Evett v. Corbin, 305 S.W.2d 469, 472 (Mo.1957) (citations omitted). As Professors Prosser and Keeton point out, in tort law,
[tjhere is a definite tendency to impose greater responsibility upon a defendant whose conduct was intended to do harm, or was morally wrong.... The defendant’s interests have been accorded substantially less weight in opposition to the plaintiffs claim to protection when moral inequity is thrown into the balance. Apparently, the courts have more or less unconsciously worked out an irregular and poorly defined sliding scale by which the defendant’s liability is least when the conduct is merely inadvertent, greater for acts in disregard of consequences increasingly likely to follow, greater still for intentionally invading the rights of another under a mistaken belief of committing no wrong, and greatest of all where the motive is a malevolent desire to do harm.
Prosser, § 8, at 37 (footnotes omitted). It is illogical and inequitable to reward a defendant for morally reprehensible conduct. Therefore, we respectfully disagree with Schuss and the other decisions cited above.
Accordingly, the question whether the insured in Brooks had acted “intentionally” was not at issue in the underlying lawsuit. Rather, the trier of fact had only to determine whether the insured owed a duty to the plaintiff to prevent her assault and rape and whether he had breached that duty by failing to intervene. Thus, it was proper, pursuant to the established exception to the majority rule, for this court to consider evidence regarding the insured’s intent extrinsic to the allegations of the underlying complaint.
In contrast to Brooks, the underlying complaints in Blanco and Bayudan had alleged claims for relief sounding in both negligence and intentional tort. See Blanco, 72 Haw. at 12, 804 P.2d at 878; Bayudan, 87 Hawai'i at 385-86, 957 P.2d at 1067-68. Thus, in the underlying cases, the potential existed for a judicial determination that the insured had not acted intentionally but had, nevertheless, breached a duty owing to the plaintiff, thereby legally causing injury. Inasmuch as the issue of the insured’s intent was subject to resolution in the underlying lawsuits, the circumstances of Blanco and Bayudan fell outside the exception to the majority rule.
It appears to us that the implications of Brooks and Blanco place those decisions in the camp of the jurisdictions that permit insurers to rely upon any evidence in support of their efforts to defeat the contractual duty to defend. However, we are convinced, as DRP argues, that the application of the Bay-udan corollary to the Brooks /Blanco analysis is subversive of the general rule that the insurer must assume its duty to defend if there is a possibility of coverage and that the insured’s reasonable expectation in contracting for the insurer’s duty to defend would be unjustifiably frustrated.
We are aware that,
[although “the doctrine of stare decisis is subordinate to legal reasons and justice and we should not be unduly hesitant to overrule a former decision when to do so would bring about what is considered a manifest justice,” Robinson v. Ariyoshi, 65 Haw. 641, 654 n. 10, 658 P.2d 287, 298 n. 10 (1982) (quoting McBryde Sugar Co. v. Robinson, 54 Haw. 174, 180, 504 P.2d 1330, 1335, aff'd on rehearing, 55 Haw. 260, 517 P.2d 26 (1973), appeal dismissed for want of jurisdiction and cert. denied, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 (1974)), “a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it.” Johnston v. RFC Nat’l Management Co., 71 Haw. 229, 233, 788 P.2d 159, 161 (1990) (internal quotation signals and citation omitted).
State v. Stocker, 90 Hawai'i 85, 95, 976 P.2d 399, 409 (1999).
Nevertheless, we are inescapably led to the conclusion that, by misapplying our own holding in Standard Oil, this court took a wrong turn in Blanco and, at least by implication, in Brooks. In order to restore manifest justice as between insurers and in *422 sureds, we therefore overrule Brooks and Blanco to the limited extent that they imply that an insurer may rely upon extrinsic facts that may be subject to dispute in the underlying lawsuit as a basis for disclaiming its duty to defend where the complaint in the underlying lawsuit alleges facts within coverage.[13] Instead, we adopt the majority rule to the contrary, along with its limited exception—that the insurer may only disclaim its duty to defend by showing that none of the facts upon which it relies might be resolved differently in the underlying lawsuit.[14] Cf. Commerce, 73 Haw. at 327, 832 P.2d at 736 (holding that “ ‘[a]n insurer has a duty to proceed in defense of a suit, at least to the point of establishing that liability upon which plaintiff was relying was in fact not covered by the policy, and not merely that it might not be’ ” quoting 7C J. Appleman, Insurance Law and Practice § 4683.10 at 69 (Berdal ed.1979)); Sentinel, 76 Hawai'i at 289, 875 P.2d at 906 (holding that, “[i]n order for the potential for coverage under [the insurer’s] policies to be considered non-existent, all of the operative assumptions made by [the insurer] would have to be correct” (emphases in original)).
On the record before us, it was impossible for Island to show that the facts upon which it relied would be resolved identically in the underlying lawsuit. Facts that were uncon-troverted at the time of tender might take new shape at a future trial or through additional discovery. For example, (1) Nakamu-ra could testify that he was either “on call” or making a delivery on the night in question, or (2) one party could produce a witness to testify to facts establishing that Nakamura had been acting within the scope of his employment.
The only evidence of the facts that were available to Island at the time DRP tendered its defense and Island refused the tender was the affidavit of Island’s claims representative, James Araki.[15] Araki *423 averred no facts unrelated to the matters at issue in the underlying lawsuits that might serve as a basis for Island’s disclaimer of its duty to defend. Instead, he averred facts indicating that Nakamura had acted (1) outside the- scope of his employment and (2) without the tacit or express permission or encouragement of DRP. Because these alleged facts are inextricably linked to the plaintiffs’ claims in the underlying lawsuits, they may be subject to dispute and must be resolved in those proceedings. Accordingly, inasmuch as the complaints alleged facts that would be covered under the commercial garage liability policy, Island owed a duty to defend DRP in the underlying lawsuits.
Island points out that, subsequent to its refusal of DRP’s tender of defense, it obtained Nakamura’s deposition, in which he too testified to facts supporting Island’s theory that he was not acting within the scope of his employment and that his employers did not negligently supervise him. As noted above, however, the duty to defend is determined as of the time of tender. Moreover, the substance of Nakamura’s testimony was inextricably intertwined in the factual matters at issue in the underlying lawsuits and cannot, therefore, serve as a basis for disclaiming the duty to defend.
• Accordingly, we hold that DRP was entitled to partial summary judgment with respect to Island’s duty to defend, inasmuch as Island was obligated to defend DRP pursuant to the commercial garage liability policy as of the time of tender.
2. Island was entitled to judgment with regard to its duty to indemnify DRP pursuant to the commercial garage liability policy.
Although Island owed a duty to defend DRP as of the time of tender, it does not necessarily follow that Island is required to indemnify DRP. See State Farm Ins. Co. v. GTE Hawaiian Tel. Co., Inc., 81 Hawai'i 235, 242, 915 P.2d 1336, 1342 (1996) (noting that, in Sentinel Ins. Co., 76 Hawai'i at 295, 875 P.2d at 912, this court “rejected” the rule that “an insurer’s breach of the duty to defend results in an irrebuttable presumption that the insurer is obligated to indemnify its insured”). As discussed supra in section III. A.2, with regard to the issue of indemnity, Island did not bear the onerous burden of disproving any possibility of coverage. Accordingly, with respect to the issue of indemnity, the circuit court was entitled to consider any competent evidence adduced in the cause of adjudicating DRP’s complaint for declaratory relief, even if the evidence might be subject to dispute in the underlying lawsuits.
Nakamura testified in his deposition that the accident occurred (1) some ten hours after the end of his work day, (2) while he was driving home, and (3) after having given a ride to a friend. On these particular facts, no plausible argument could be made that Nakamura was performing “garage operations” or “garage business” at the time of the accident.
DRP offered no evidence to rebut Naka-mura’s account of the relevant events and, in fact, failed even to dispute it. As noted supra in section III.A.2, DRP was not entitled simply to rely on its pleadings in the face of evidence supporting Island’s motion for summary judgment. Accordingly, although our task is to evaluate the evidence in the light most favorable to DRP, we are compelled to hold that no genuine issue of material fact remained and that Island was entitled to judgment as a matter of law.
Although, as we held supra in section III. B.l, Island owed DRP a duty of defense as of the time the defense was tendered and refused, that duty cannot survive the effect of our holding in this section. See Liberty Mut. Ins. Co. v. Superior Court, 58 Cal.App.4th 617, 68 Cal.Rptr.2d 219, 223 (1997) (“An insurer’s duty to defend continues only so long as the possibility of [a] duty to indemnify remains alive. Once that possibility is extinguished by court order, the duty to defend ceases.”); cf. Commerce & Indus. Ins. Co., 73 Haw. at 326, 832 P.2d at 736 (holding that the insurer’s duty to defend continues “until *424 it [can] confine the claim to a recovery that the policy did not cover”) (quoting Lee v. Aetna Cas. & Sur. Co., 178 F.2d750 (2d Cir.1949)).[16] In other words, no “possibility” of coverage pursuant to the commercial garage liability policy will remain after the circuit court, on remand, enters its judgment, pursuant to this opinion, declaring that Island owes no duty to indemnify DRP in connection with the underlying lawsuits pursuant to the commercial garage liability policy.
On the record before us, therefore, we hold that Island owed a duty to defend DRP beginning on February 6, 1995, the date of DRP’s tender of its defense pursuant to the commercial garage liability policy, and ending on the date of the circuit court’s entry of judgment on remand pursuant to this opinion. Because Island did not assume DRP’s defense at the time of tender, it is responsible for DRP’s reasonable costs, if any, associated with its defense in the underlying lawsuits incurred during the above-described period of time. See Sentinel Ins. Co., 76 Hawai'i at 296, 875 P.2d at 913 (holding that “if [an insurer] loses its claim of no duty to defend, it will be obliged to reimburse the insured for all reasonable defense fees and costs properly incurred” (citation omitted)).
C. Island Owes A Duty To Defend DRP Pursuant To The Business Auto Policy.
The circuit court ruled that Island was not required to defend DRP pursuant to the business auto policy because “the involved vehicle was not listed in the policy as a covered auto.” On appeal, DRP argues that, although Nakamura’s truck was not expressly listed as a covered auto in the policy, several portions of the policy indicated that accidents involving the use of automobiles not owned by the insured were also “covered” for purposes of the policy.
As noted supra in section I.B.l, Part IV(A)(1) of the policy provides that coverage is available in relevant part for “bodily injury ... to which this insurance applies, caused by an accident and arising from the ownership, maintenance or use of a covered auto.” (Emphasis in original.) Island does not appear to dispute that Vierra suffered “bodily injury” arising from an “accident.” Accordingly, the only remaining issue is whether Nakamura’s truck was a “covered auto.”
On its face, Part II of the policy indicates that the determination of which vehicles are “covered autos” is accomplished by reference to “ITEM TWO of the declarations.” Island did not include that page of the policy in its memoranda in support of or opposition to the motions for summary judgment regarding the business auto policy. As DRP points out, several other portions of the policy refer (somewhat ambiguously) to coverage for “employer’s non-owned” or “employer’s non-ownership.” [17] However, without the benefit of “ITEM TWO of the declarations,” the circuit court could not have definitively concluded, in the context of a motion for summary judgment, which vehicles constituted “covered autos” pursuant to the policy and which did not.[18] Based on the evidence be *425 fore the circuit court at the time of the motions for summary judgment, we hold that the circuit court erred in granting Island’s motion with respect to its duty to defend.
Island contends that “no coverage exists under the business auto policy because the vehicle was not used in connection with business operations.”[19] Island’s interpretation would modify the language in the body of the business auto policy by taking from the policy title the word “business” and inserting it in the coverage language. Thus, Island focuses on the title as limiting the available coverage.
“The label attached to a policy is not determinative of the type and scope of coverage provided.” Aks v. Southgate Trust Co., 844 F.Supp. 650, 656 (D.Kan.1994) (citing Burks v. Aldridge, 154 Kan. 731, 121 P.2d 276 (1942)); see also St. Paul Fire and Marine Ins. Co. v. Gilmore, 168 Ariz. 159, 812 P.2d 977, 983 (1991) (noting that “the type of policy is determined by the type of coverage provided, not by the label affixed by the insurer”); Selander v. Erie Ins. Group, 85 Ohio St.3d 541, 709 N.E.2d 1161, 1164-65 (1999) (same (citing Gilmore, 812 P.2d at 983)); Stanley v. Safeco Ins. Co. of America, 109 Wash.2d 738, 747 P.2d 1091, 1093 (1988) (noting that “[i]t has long been our rule that the caption should never of itself be taken to override the intention of the parties to an insurance policy as shown by the provisions and clauses inserted thereunder” (citations and internal quotation signals omitted)); Action Ads, Inc. v. Great American Ins. Co., 685 P.2d 42, 45 (Wyo.1984) (observing that “[t]he coverage clause, not the policy titles, controls ... and these admittedly broad labels cannot override the express provisions of the coverage paragraph”); but see Martin v. Allianz Life Ins. Co. of North America, 573 N.W.2d 823, 827 (N.D.1998) (noting that “we would ordinarily consider insurance contract titles as descriptive of the coverage provided”). This court may not, therefore, decide that the term “business” necessarily trumps whatever the coverage clause of the business auto policy might provide.
Regardless of the title of the policy, it is possible that Nakamura’s vehicle was a “covered auto” pursuant to the business auto policy. Nakamura’s father, as a part-owner of DRP, might have included Nakamura’s vehicle on the policy. Nakamura’s vehicle might have been covered as an “employer’s non-owned” vehicle. In any case, it is impossible to discern, without “ITEM TWO of the declarations,” what the coverage status of Nakamura’s vehicle might have been. Accordingly, the circuit court erred in granting Island’s motion for summary judgment with regard to the business auto policy “on the basis that the involved vehicle was not listed in the policy as a covered auto.”
For the same reasons, we hold that the circuit court erred in granting Island’s motion for summary judgment with respect to Island’s duty to indemnify DRP. The policy language referring to “non owned autos,” adduced by Island in connection with its motions for summary judgment, raised a genuine issue of material fact regarding whether the policy extended to automobile accidents involving vehicles not owned by DRP.
Although DRP’s motion for summary judgment did not raise the issue of the business auto policy,
this court is empowered to order [the] lower court to enter summary judgment in favor of [a] non-moving party where no genuine issue as to any material fact ex-istís] and [the] non-moving party [is] entitled to summary judgment as a matter of law[,] even though [the non-moving] party failed to file a cross motion for summary judgment in the lower court.
Estate of Doe, 86 Hawai'i at 270, 948 P.2d at 1111 (quoting First Ins. Co. of Hawai‘i, Inc. v. State, 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (citing Flint v. MacKenzie, 53 Haw. 672, 501 P.2d 357 (1972))). None of the “extrinsic facts” adduced by Island forestall the coverage indicated by the business auto policy. See supra section III.B.l.
*426 Inasmuch as there was a genuine issue of material fact regarding whether the business auto policy extended coverage to Nakamura’s vehicle, there was at least a possibility of coverage under the policy because ITEM TWO might have indicated that Nakamura’s vehicle was a “covered auto.” As noted above, the duty to defend arises “wherever there is the mere potential for coverage.” Sentinel Ins. Co., 76 Hawaii at 287, 875 P.2d at 904 (citation omitted). Accordingly, we hold that Island owes DRP a duty to defend pursuant to the business auto policy.[20]
D. Island Was Entitled to Summary Judgment With Respect To Its Duty To Defend And Indemnify DRP Pursuant To The Commercial General Liability Policy.
Island argues that the circuit court correctly relied upon the exclusion set forth in section I.A.2.g of Island’s commercial general liability policy to rule that there was no possibility of coverage under that insurance policy. In effect, Island argues (1) that Na-kamura was acting outside the scope of his employment when the accident occurred, in which case DRP would not be liable for his conduct under a theory of respondeat superi- or, or in the alternative (2) that Nakamura was acting within the scope of his employment, in which ease the section I.A.2.g exclusion applies. Island’s logic is persuasive.
On the one hand, if Nakamura acted within the scope of his employment, section I.A.2.g applies. Section I.A.2.g excludes coverage for “bodily injury” arising out of the use of an “auto ... owned or operated by ... any insured.” Section II of the policy provides in relevant part that DRP’s employees were “insureds,” “but only for acts within the scope of their employment[.]”[21] The automobile at issue in the present matter was owned and operated by Nakamura. If Naka-mura was acting within the scope of his employment and was therefore an “insured” for purposes of the commercial general liability policy, section I.A.2.g would preclude coverage.
On the other hand, if Nakamura was not acting within the scope of his employment, section I.A.2.g does not apply. DRP suggests that, under this scenario, “coverage is triggered under the C[ommercial] G[eneral] Liability] policy.” DRP does not articulate, however, any theory of negligence under which DRP might be liable for Nakamura’s action such that the commercial general liability policy would come into play.
One of the complaints alleges that DRP was vicariously liable for Nakamura’s negligence, presumably under the theory of respondeat superior. “Under the theory of respondeat superior, an employer may be liable for the negligent acts of its employees that occur within the scope of their employment.” Wong-Leong v. Hawaiian Independent Refinery, Inc., 76 Hawai'i 433, 438, 879 P.2d 538, 543 (1994) (emphasis added). Accordingly, for DRP to be liable under the respondeat superior theory, Nakamura would have to have been acting within the scope of his employment. As noted above, however, if Nakamura was acting within the scope of his employment, the section I.A.2.g exclusion would apply, and there would be no coverage under the commercial general liability policy.
Both complaints in the underlying lawsuits allege that DRP was “negligent,” but they fail to clarify this allegation. It could be argued that DRP was liable under the theory of negligent supervision or failure to control.
The standards for this theory may be found in Restatement (Second) of Torts § 317 (1995):
*427 § 317. Duty of Master to Control Conduct of Servant.
A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) The servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control.
Id. at 444, 879 P.2d at 549 (emphasis added). In Wong-Leong, this court endorsed the view that the provisions of Restatement (Second) of Torts § 317(a) governed the outcome of a claim of negligent failure to control, asserted against an employer, under circumstances in which an employee was involved in an automobile accident after drinking alcohol on the employer’s premises and the plaintiffs alleged that the consumption of alcohol was a legal cause of the accident. Id. at 436-37, 445, 879 P.2d at 541-42, 550.
In the present matter, however, the plaintiffs in the underlying lawsuit have failed to state a claim for negligent supervision. Both complaints assert that, at all times material, Nakamura was acting within the scope of his employment. Inasmuch as negligent supervision may only be found where an employee is acting outside of the scope of his or her employment, the complaints in the underlying lawsuit cannot be said to state a claim for negligent supervision. Accordingly, DRP cannot be found liable for negligently supervising Nakamura. Inasmuch as it would be impossible for the Vierras or Wolken-Vierras to prevail against DRP in the underlying lawsuits on a claim of negligent supervision, Island bears no burden of defending DRP regarding a negligent supervision claim. See Sentinel Ins. Co., 76 Hawai'i at 287, 875 P.2d at 904 (noting that the duty to defend “rests primarily on the possibility that coverage exists” (citation omitted)).
Nakamura was either acting within the scope of his employment, triggering the section I.A.2.g exclusion, or he was not, in which case DRP cannot be found liable, inasmuch as the underlying complaints failed to plead negligent supervision. Therefore, we hold that the circuit court did not err in ruling that the “auto accident exclusion,” set forth in section I.A.2.g of Island’s commercial general liability policy, dispelled the possibility of coverage thereunder.
E. Island Was Entitled to Summary Judgment With Respect To Its Duty To Defend And Indemnify DRP Pursuant To The Commercial Umbrella Insurance Policy.
The circuit court ruled that a genuine issue of material fact remained with respect to Island’s duty to defend and indemnify pursuant to the commercial umbrella insurance policy. On appeal, Island argues that the exclusion for accidents arising out of the use of an automobile by employees, set forth in Endorsement ICU-103, forecloses the possibility of coverage. For the same reasons articulated in section III.D, supra, we agree.
The exclusionary language of Endorsement ICU-103 applies, inter alia, to the use of an “ ‘auto’ operated by any person in the course of that person’s employment by [the insured].” As above, Nakamura was either acting within the scope of his employment, triggering the Endorsement ICU-103 exclusion, or he was not, in which case DRP cannot be found liable, inasmuch as the underlying complaints failed to plead negligent supervision. Therefore, we hold that the circuit court erred in denying Island’s motion for summary judgment and granting DRP’s motion for summary judgment with regard to the commercial umbrella insurance policy.
*428 IV. CONCLUSION
Based on the foregoing analysis, we vacate both of the circuit court’s orders concerning the parties’ motions for summary judgment, as well as the circuit court’s HRCP Rule 54 final judgment, and remand this matter for the entry of orders (1) granting in part and denying in part both parties’ motions for summary judgment regarding the commercial garage liability policy, (2) granting DRP summary judgment with regard to Island’s duty to defend pursuant to the business auto policy, (3) granting Island’s motion for summary judgment concerning the commercial umbrella insurance policy and the commercial general liability policy, (4) denying Island’s motion for summary judgment concerning the business auto policy, and (5) denying DRP’s motion for summary judgment concerning the commercial general liability policy and the commercial umbrella insurance policy.
In furtherance of the foregoing orders, the circuit court should declare, as follows, in its judgment on remand:
(1) Island owed a duty to defend DRP pursuant to the commercial garage liability policy beginning on the date of tender, February 6, 1995, and ending on the date of the circuit court’s entry of judgment on remand pursuant to this opinion; and
(2) Island owes a duty to defend DRP pursuant to the business auto policy.

. Shell Oil Company, a coplaintiff in the action in the circuit court, has not participated in the present appeal, having apparently been dismissed as a defendant in both of the underlying lawsuits.

. In their complaint for declaratory relief, DRP and Shell also prayed for an award of "costs, attorneys’ fees and prejudgment interest ... and all other relief including money damages which this Court deems just and proper." Inasmuch as neither of the parties raise any arguments with respect to the foregoing prayer for relief, we do not address it herein.

. That section, subtitled "SCHEDULE OF COVERAGES AND COVERED AUTOS,” includes a chart detailing various types of coverages included in the policy and the "COVERED AUTOS,” policy limits, and premium amounts associated with each type of coverage. In the blank for "COVERED AUTOS” associated with "LIABILITY INSURANCE—Bodily Injury; Property Damage,” the symbol "1” is indicated. Symbol “1” is- described in "ITEM THREE” at the bottom of the page as "ANY AUTO.” In addition, "ITEM TWO” indicates, in a blank for "UNINSURED MOTORISTS INSURANCE,” the symbol "2,” which is described in "ITEM THREE" as follows: "OWNED AUTOS ONLY. Only those autos you own (and for liability coverage and trailers you don’t own while attached to power units you own). This includes those autos whose ownership you acquire after the policy begins.” (Boldface emphasis in original.) In blanks for "Comprehensive Coverage” and “Collision Coverage,” the symbol "7” is indicated. Symbol "7” is described in ITEM THREE as follows: "SPECIFICALLY DESCRIBED AUTOS. Only those autos described in ITEM FOUR for which a premium charge is shown (and for liability coverage for trailers you don’t own while attached to any power unit described in ITEM FOUR).” (Bold face emphases in original.) Other symbols described in "ITEM THREE” include the captions "HIRED AUTOS ONLY” and "NONOWNED AUTOS ONLY.”

. DRP's motion requested only partial relief, inasmuch as it did not address the issue of Island’s duty to indemnify it and Shell pursuant to the policies.

. We note that the circuit court clearly erred insofar as it purported to grant summary judgment in favor of DRP with respect to Island's duty to defend, pursuant to the commercial garage liability and commercial umbrella insurance policies, while, at the same time, ruling that genuine issue of material fact existed with regard to those policies. Such a ruling flouts the very nature of summary judgment. See infra section II.A.

. HRCP Rule 54(b) provides in relevant part that,
[wjhen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. ...

.As noted supra in note 5, inasmuch as the circuit court had ruled that a genuine issue of material fact existed with regard to Island’s duly to defend pursuant to the commercial garage liability policy and the commercial umbrella insurance policy, it erred in granting final judgment to DRP on those issues without the benefit of trial.

. But see our discussion infra in section III.B.3 regarding staying a declaratory judgment action concerning indemnity pending the adjudication of the underlying lawsuit.

.We note that, in Spruill Motors, Inc., the decision quoted in Standard Oil, the Kansas Supreme Court carried the above-described concept one step farther. In Spruill Motors, Inc., the court held that although intentional acts were excluded from coverage by the insurance policy at issue, and the underlying complaint expressly alleged that the plaintiff had been injured because of the intentional acts of the insured’s agent, the insurer nevertheless was subject to a duty to defend because the information independently available to the insurer demonstrated that the insured’s agents’ acts had, in fact, been negligent rather than intentional. See Spruill Motors, Inc., 512 P.2d at 408. Thus, even where the language of the complaint affirmatively and unambiguously excluded the possibility of coverage, Spruill Motors, Inc. required the insurer to investigate further to determine whether there was a possibility of coverage in any event. We do not believe that the Standard Oil court intended to endorse so expansive a view, and we do not do so now. Cf. Pancakes of Hawaii, Inc. v. Pomare Properties, 85 Hawai'i 286, 291, 944 P.2d 83, 88 (App.1997) (" 'Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend.’ ”) (Quoting Hawaiian Holiday Macadamia Nut Co., 76 Hawai'i at 169, 872 P.2d at 233 (quoting Hawaiian Ins. & Guar. Co. v. Blair, Ltd., 6 Haw.App. 447, 449, 726 P.2d 1310, 1312 (1986)) (internal quotation marks and citations omitted)).

. The ICA’s observation was apparently dictum, inasmuch as the actual holding in Bayudan was that the insurer was not required to defend the insured based on the allegations of the complaint itself. 87 Hawai’i at 384-88, 957 P.2d at 1066-70.

. The "named insured” on the Brooks policy was an automobile repair company that owned the truck used to perpetrate the acts against the plaintiff in the underlying lawsuit. The driver of the truck on the date of the incident was an additional insured pursuant to a provision of the policy extending coverage to "any other person while using an owned automobile ... with the permission of the named insured[.]” Brooks, 67 Haw. at 290, 686 P.2d at 26.

. California and Indiana appear to be divided internally on the issue. Compare Montrose Chemical Corp., 24 Cal.Rptr.2d at 474, 861 P.2d 1153 (holding that “[a] carrier remains free to seek declaratory relief if undisputed facts conclusively show, as a matter of law, there is no potential for liability” (emphasis added) (citation and internal quotation signals omitted)), Horace Mann Ins. Co. v. Barbara B., 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 214, 846 P.2d 792 (1993) (noting that "[t]he [California] courts of appeal have expressed varying views on the question of whether the insurer must defend when the complaint on its face shows a potential for coverage but extrinsic facts are to the contrary” (citations omitted), but declining to address the issue), and A-H Plating v. American Nat'l Fire Ins., 57 Cal. App.4th 427, 67 Cal.Rptr.2d 113, 121 (1997) (holding that "an insurer cannot avoid the duty to defend merely by concluding, based on its own investigation, that the insured has done no wrong") with Waller v. Truck Ins. Exchange, Inc., 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 379, 900 P.2d 619 (1995) (noting, in dictum, that, "where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability” (citations omitted)), Monteleone v. Allstate Ins. Co., 51 Cal.App.4th 509, 59 Cal.Rptr.2d 48, 52 (1997) (holding that extrinsic facts may be considered even where the allegations of the complaint indicate coverage), and Charles E. Thomas Co. v. Transamerica Ins. Group, 62 Cal.App.4th 379, 72 Cal.Rptr.2d 577, 579 (1998) (holding that extrinsic facts may be considered). See also Huntzinger v. Hastings Mut. Ins. Co., 143 F.3d 302, 308-09 & n. 8 (7th Cir.1998) (noting that, in Transamerica Ins. Servs. v. Kopko, 570 N.E.2d 1283, 1285 (Ind.1991), the Indiana Supreme Court held that the "duty to defend is determined solely by the nature of the complaint,” but that subsequent Indiana Courts of Appeals opinions have not been consistent with Kopko).

. By our action today, we do not intend to call into question the ongoing viability of Brooks and Blanco in any other respect. Neither do we intend to disturb any decision that relied upon Brooks and Blanco in addressing any question separate and apart from, an insurer's basis for disclaiming its contractual duty to defend. See, e.g., AIG Hawaii Ins. Co. v. Estate of Caraang, 74 Haw. 620, 851 P.2d 321 (1993).

. One example of an extrinsic fact upon which an insurer might rely pursuant to the new rule arises when an insurer argues that an occurrence was outside of the effective period of the policy. In such a case, the factual issue regarding the parameters of the effective period of the policy would not normally be subject to dispute in the underlying action. Cf. Sentinel, 76 Hawaii at 289, 875 P.2d at 906 (appearing to accept that an insurer had proved that damages in the underlying action "manifested themselves before [the] policy period began,” but holding that the insurer's other operative assumptions were not conclusively proven).
Moreover, where the facts at issue can no longer be disputed in the underlying lawsuit because they have already been conclusively established for purposes of those proceedings prior to the resolution of the declaratory judgment action, we see no reason why evidence of such facts should not be available in the declaratory judgment action. See Sterilite Corp. v. Continental Cas. Co., 17 Mass.App.Ct. 316, 458 N.E.2d 338, 344 (1983) (holding that an insurer "can, by certain steps, get clear of the duty [to defend] from and after the time when it demonstrates with conclusive effect on the third party that as a matter of fact—as distinguished from the appearances of the complaint and policy—the third party cannot establish a claim within the insurance,” but that "[w]hat is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and the policy by dint of its own assertion that there is no coverage in fact” (emphasis added)). For example, if the parties to the underlying lawsuit stipulate to certain facts, as they did in Blanco, those facts would be conclusively established for purposes of the duty to defend because they would no longer be subject to dispute in the underlying lawsuit. We note, however, that the stipulation in Blanco was not signed until after the insurer had refused the insured’s tender of defense. Inasmuch as the duty to defend is determined as of the time of tender, the stipulation would only have affected the insurer's duties after the stipulation was entered into.

.On appeal, DRP challenges the sufficiency of the evidentiary foundation for Araki's affidavit for purposes of admissibility. As Island rightly points out, however, DRP never raised its eviden-tiary objection in the circuit court. Accordingly, DRP waived that issue. See Craft v. Peebles, 78 Hawai'i 287, 294, 893 P.2d 138, 145 (1995). DRP also argues that Araki’s affidavit does not indicate when Araki gained the information to which he avers in his affidavit, observing that, in a letter dated after Island's first refusal of DRP’s tender of defense, Island's counsel represented that "[a] factual investigation of this matter is undeveloped!.]” However, Island justifiably re *423 torts that Araki's statement that he "referred the matter” to Island’s counsel "[biased on the information obtained for [Island's] investigation” indicates that all of the information was gathered prior to the denial of the tender of defense.

. In Taylor v. GEICO, 90 Hawai'i 302, 312 n. 9, 978 P.2d 740, 750 n. 9 (1999), we noted a split in the jurisdictions on the question whether an insurer may, consistent with public policy, terminate its duty to defend by paying the full policy limits. That question is not at issue in this appeal, however, inasmuch as Island never offered to pay pursuant to the policies. By contrast, as noted above, the precedent in our own jurisdiction is clear that, where all indemnifiable claims have been disposed of, the insurer’s duty to defend terminates.

. Island argues that the affidavit of DRP's insurance agent, Roger Yamagata, indicates that the policy’s coverage of “non owned vehicles” was intended by the parties to relate solely to "vehicles used in connection with business operations.” However, Yamagata’s affidavit was not attached to any of the parties’ memoranda regarding the motions for summary judgment. DRP brought Yamagata’s affidavit to the attention of the circuit court in connection with its motions for reconsideration of the circuit court’s orders concerning the motions for summary judgment. Accordingly, Yamagata’s affidavit bears only on the question whether the circuit court erred in denying DRP's motion for reconsideration.

.Although the exhibits attached to Island’s motion for summary judgment indicate that DRP paid premiums on four particular automobiles, that evidence is not sufficient to prove that Naka-mura’s vehicle was not covered under the business auto policy.

. Contrary to Island’s assertion, as noted previously, it is possible that facts could emerge at a future trial or through additional discovery indi-eating that Nakamura was, in fact, using the vehicle in connection with business operations.

. Whether Island also owes DRP a duty to indemnify pursuant to the business auto policy must be determined at a later date, inasmuch as a question of fact remains regarding whether Nakamura’s vehicle was a "covered auto.” Cf. Sentinel Ins. Co., 76 Hawai'i at 287, 875 P.2d at 904.
Inasmuch as we rule in favor of DRP with respect to Island's motion for summary judgment on the issue of Island’s duty to defend and indemnify pursuant to the business auto policy, we need not address the circuit court’s denial of DRP’s motion for reconsideration on the issue.

. The parties do not dispute that DRP is an "insured” under the policy. Because it is DRP, and not Nakamura, that tendered its defense to Island, Nakamura's status as an "insured” is relevant only to the exclusion set forth in section I.A.2.g.